## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Special Agent Keith Murray of the Federal Bureau of Investigation (hereinafter FBI), being duly sworn, deposes and states as follows:

**I.      INTRODUCTION**

1. On February 15, 2019, the FBI was made aware of a recorded phone conversation containing a threat between B.R., an employee of Coastal Credit LLC, and PHILLIP CLINE JR (hereinafter CLINE), a resident of Elkton, Maryland. B.R. had called CLINE to arrange a payment plan with CLINE to pay off his delinquent auto loan owed to COASTAL CREDIT LLC. During the recorded telephone conversation, CLINE used racially biased language and threatened physical harm to B.R. During the subsequent investigation, CLINE admitted to the investigators that he made the threatening remarks to B.R.

2. A search of CLINE's criminal history revealed that CLINE is a prohibited possessor of any firearm or any ammunition of any type. On December 5, 2013, CLINE pleaded guilty in the Circuit Court of Cecil County to Assault – Second Degree, a Maryland misdemeanor with a maximum penalty of 10 years in prison. A review of CLINE's Facebook Social Media page revealed several photos of CLINE holding both shotguns and rifles, with the dates of the those photos in 2018 and 2019, respectively. Additionally, during an interview with investigators on December 12, 2019, CLINE's ex-wife, J.C., stated that during her relationship with CLINE, he possessed several firearms that he used for hunting and stored them inside his residence, in a safe to which he had sole access. During that interview, J.C. also told the investigative team that one of CLINE's sons informed her that CLINE took a week off from work to go hunting within the past two months.



## II. AFFIANT'S EXPERTISE AND KNOWLEDGE

1. Your Affiant, Keith Murray, has been a duly sworn Special Agent with the Federal Bureau of Investigation since July of 2017. Your Affiant has participated in several criminal investigations involving police corruption, corruption of state and local public officials, white-collar crimes, civil rights violations, firearms offenses and other unlawful activities. I have a finance degree, and prior to joining the FBI in Baltimore I was a SA with Homeland Security Investigations working investigations involving drug trafficking, firearms offenses, human smuggling, and bulk cash smuggling.

2. Your Affiant has participated in several financial investigations and debriefings of individuals involved in corruption and firearms offenses, including confidential human sources. Your Affiant has also participated in numerous searches, arrests and seizure warrants involving a variety of offenses, including firearms offenses.

3. I have personally participated in the investigation of the offense(s) referred to herein and have reviewed reports and have had discussions with other FBI SA's, Task Force Officers (TFOs) and employees of the FBI, as well as other law enforcement agencies related to the investigation of the Defendant. I am fully familiar with the facts and circumstances of the investigation.

4. The statements contained in this affidavit are based in part on information provided by SA's and TFO's of the FBI (collectively, the "Investigators"). The information contained in this affidavit is also based in part on: the review of written reports of investigations; the review of law enforcement and other government databases; sources of information and other witnesses. Because this affidavit is being submitted for the limited purpose of securing authorization for the



execution of search and seizure warrants, I have not included each and every fact known to me concerning this investigation. Nor, do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit. Your affiant has not, however, excluded any information known to your affiant which would defeat the determination of probable cause. I have set forth only the facts that I believe necessary to establish the foundation of probable cause in support of this application for search and seizure warrant(s).

5. Based on evidence developed during the course of the investigation and outlined in part below, I submit that the facts set forth in this affidavit establish that there is probable cause to believe that CLINE did knowingly and unlawfully possess one or more firearms, in violation of Title 18 U.S.C. § 922 (g) (1) (illegal possession of a firearm for anyone who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year).

6. This offense (identified in preceding paragraph 5), is hereinafter referred to as the **Target Offense**.

### III. PREMISES TO BE SEARCHED

7. Accordingly, your affiant submits there is probable cause to believe that the items set forth in Attachment B, all of which constitute evidence, fruits, and instrumentalities of, *inter alia*, violations of the Target Offense, are presently located at the following location (the "Target Location," more fully described in Attachment A), including the residence, living spaces at the residence, curtilage, yard, land, perimeter, garage, structures, vehicles and all areas within the four corners of the **Target Location**:

a. The physical residence located at 365 W Main Street, Elkton, Maryland, 21921. This residence belongs to CLINE. CLINE has been interviewed at the Target Location on



two (2) occasions and has identified this residence as his home during one of the interviews. CLINE resides at the Target Location with his fiancée and several children.

## II. BACKGROUND

### A.  The Investigation

1.  On February 1, 2019, B.R., an employee at COASTAL CREDIT LLC, a national auto loan agency based in Indianapolis, Indiana, was instructed to contact CLINE regarding his delinquent car payment. B.R. called CLINE from COASTAL CREDIT LLC's office in Indianapolis, Indiana, by dialing phone number (302) 893-3189, (the Target Phone) which was obtained by COASTAL CREDIT LLC via caller ID when CLINE contacted their office on January 26, 2019. B.R. advised CLINE the call was being recorded, and began asking him questions to verify that she was in fact speaking with CLINE. CLINE became increasingly angry and questioned B.R. how she obtained the number to the Target Phone. CLINE started threatening B.R. and repeatedly called her a "nigger" and a "black nigger bitch". CLINE told B.R. during the call that "all my fucking white power friends will hang your ass." D.M., a Senior Manager at COASTAL CREDIT LLC, reported that B.R. is African American. D.M. also reported that CLINE might have assumed B.R. was African American by the "inflection in her voice," because they have never met in person.

2.  Below is an uncertified transcript of the recorded phone conversation between CLINE and B.R. from February 1, 2019.

> Cline:  What? What?
>
> B.R.:   Hi, I'm looking for Phillip Cline…
>
> Cline:  Why are you calling my phone? Huh?
>
> B.R.:   Is this Phillip Cline?

4


| | |
|---|---|
| Cline: | Yeah. Who's this? |
| B.R.: | This is uh, \_\_\_\_\_ calling with Coastal Credit on a recorded line |
| Cline: | Okay why are you… |
| B.R.: | How you doing Mr. Cline? |
| Cline: | How did you get this number? |
| B.R.: | Is this Phillip Cline? You have uh, this is Coastal Credit. |
| Cline: | Yeah but why do you…okay I know who it is. Why are you calling this number? How did you get this number? |
| B.R.: | Okay. |
| Cline: | Okay. |
| B.R.: | So I need to verify… |
| Cline: | How did you get this number? |
| B.R.: | I need to verify a few things with you and then I'll explain the reason for my call, okay? |
| Cline: | Okay. I know why you're calling. You want me tell you what? |
| B.R.: | Can you, can you give me the last four of your social? |
| Cline: | No I can't. How'd you get this number? That's my question to you. |
| B.R.: | If this is Phillip Cline, then you should already know how we got this number. |
| Cline: | Um, this is a personal work number. This is my business number. So, I'm asking you how you got it. I didn't give you this number. |
| B.R.: | Okay well I can't disclose any, any information if you don't wanna verify yourself |
| Cline: | Okay but you're fucking calling me, bitch, you can disclose anything about me. I don't know who the fuck you think you are. |



| | |
|---|---|
| B.R.: | Mister Cline… |
| Cline: | Mister Cline nothing. What's your problem? What you call me for? |
| B.R.: | Okay. Verify the last four of your social. |
| Cline: | Um, I aint verifying shit. I don't have the Cadillac. I done talked to your company a thousand and one fucking times… |
| B.R.: | Uh-huh |
| Cline: | …that I traded the car in and car is being paid off… |
| B.R.: | Okay. |
| Cline: | …on the first by. |
| B.R.: | What dealership? |
| Cline: | Where I got the car? |
| B.R.: | Where did you get the, where, what dealership? |
| Cline: | New Castle Motors. You're a fucking nigger. Don't fucking call my phone you fucking black nigger bitch. You fucking, all my fuckin' white power friends will fuckin' hang your ass. Don't call me again mother fucker. I told you this is a personal number. Do not call it or I will get you for harassment. There is a number on file that you are to call, you don't call this one nigger. Alright? |

3. On March 19, 2019, FBI SA Keith Murray and FBI TFO Jared Stern attempted to locate CLINE at TROY GRANITE located at 7111 Interchange Boulevard, Newark, Delaware, 19711. SA Murray and TFO Stern were advised by store personnel that CLINE no longer worked at TROY GRANITE and was terminated four (4) to five (5) years prior.

4. Later that day, SA Murray and TFO Stern attempted to locate CLINE at his residence located at 365 W Main Street, Elkton, Maryland, 21921. After knocking on the front door of the residence and receiving no response, SA Murray and TFO Stern observed a vehicle



pull into the driveway. A white male exited the vehicle and walked toward the front door. The individual identified himself as CLINE's son and stated he did not know if CLINE was inside the residence. Shortly thereafter, a white female exited the vehicle and identified herself as CLINE's fiancée. After being advised of the identities of SA Murray and TFO Stern, she stated she was headed to pick up CLINE from work and would be back at the residence at approximately 5:00 pm. SA Murray provided her with his FBI issued cell phone number and asked her to call when they arrived back home.

5. At approximately 4:18 pm, SA Murray received a call on his FBI issued cell phone from phone number 978-626-2817. The individual on the phone identified himself as CLINE. CLINE sounded agitated and angry, repeatedly cursing and demanding to know why the FBI was at his residence. CLINE stated it was "pathetic and embarrassing" that the FBI was attempting to speak with him. After several attempts by SA Murray to gain CLINE's cooperation to speak in person at his residence, CLINE abruptly hung up the phone.

6. At 4:50 pm, SA Murray received a call on his FBI issued cell phone again from CLINE. CLINE stated that he would be arriving at his residence in three (3) minutes. CLINE hung up the phone.

7. At approximately 4:55 pm, a vehicle pulled into the driveway at 365 W Main Street, Elkton, Maryland. CLINE, his fiancée, and a white male exited the vehicle. The unidentified white male walked down the driveway towards W Main Street, stopped and turned, and asked CLINE, "You good Phil?" CLINE responded, "Yeah I'm good." The unidentified white male continued walking towards W Main Street, stopped at the edge of the driveway and stared at the investigative team. SA Murray and TFO Stern approached CLINE and conducted an interview.



8. CLINE admitted to making the racially biased and threatening statements contained on the recorded conversation between him and B.R. CLINE made the comments to B.R. because he believed she was constantly calling him and harassing him. CLINE wanted to "push her buttons" and say something to her that would hurt her and make her angry. CLINE stated that his statements to B.R. are considered a "terroristic threat." CLINE claimed not to know anyone involved in the White Power movement or with white supremacy beliefs. CLINE stated he has a "mixed race daughter" and a "colored grandkid." CLINE said he has a tattoo of Tupac Shakur on his right calf. Because of this, CLINE stated he could not be racist.

9. On March 20, 2019, SA Murray received a phone call from Witness 1, Delaware District Manager for TROY GRANITE, regarding the employment history of CLINE.

10. Witness 1 stated prior to working for TROY GRANITE, CLINE worked for a supply company that delivered slabs of granite. CLINE was then hired to work for TROY GRANITE. CLINE had anger management issues throughout his employment. Witness 1 could not remember an incident in which CLINE physically assaulted anyone at the workplace or exhibited behavior that was racially biased. CLINE's employment with TROY GRANITE ended three (3) to four (4) years ago. Witness 1 does not remember if CLINE resigned or was terminated.

11. On May 1, 2019, D.M., a Senior Manager for COASTAL CREDIT LLC, was interviewed telephonically by SA Murray. D.M. was the supervisor for B.R. during the incident with CLINE on January 31, 2019. D.M. listened to a recording of the call between B.R. and CLINE immediately following the incident. D.M. remembered B.R. being "very shook" when she approached him and asked him to listen. D.M. described B.R. as crying, red faced, hands shaking, and visibly upset. D.M. sent B.R. home immediately after the incident so she could start to feel better. D.M. spoke with B.R. and she told him that she feared for her safety. D.M. believes that

B.R. is still affected by the incident to this day. D.M. believes the statements were threatening. At some point after the incident on the phone, the remaining balance owed on CLINE's account was paid off.

12. On April 29, 2019, B.R. was interviewed telephonically by SA Murray. At the time, B.R. was employed with COASTAL CREDIT LLC, an automobile loan agency, based out of Indianapolis, Indiana. B.R. began her employment on October 29, 2018 in the Collections Department. B.R. was promoted to the New Customer Department in March 2019. Prior to the incident on January 31, 2019, B.R. had never spoken to CLINE on the phone. B.R. may have sent texts or emails to CLINE but was not sure. CLINE was delinquent on an auto loan and his information was transferred into B.R.'s account at work. Once the information was transferred, a report is generated that indicates the amount of the loan and how past due the loan is. B.R.'s position with COASTAL CREDIT is to then find a resolution with CLINE to bring the outstanding amount up to date.

13. B.R. informed SA Murray that calls to individuals who are delinquent on loans are limited to normal business hours. In regards to the incident involving B.R. and CLINE on the phone on February 1, 2019, B.R. stated she "felt devastated." B.R. stopped speaking once CLINE began making racist remarks. CLINE's "racial profiling" left B.R. "stunned" and she could not stop crying. After the call with CLINE ended, B.R. immediately went to her supervisor. B.R. feared for her safety following the call: prior to the phone call, B.R. had sent emails to CLINE about his delinquent loan payments and B.R. feared that CLINE would look her up on social media outlets to find her. B.R. had to leave work once the call ended because of the effect it had on her. B.R. stated that CLINE has not tried to reach out to her since the incident.

14. B.R. later learned that the outstanding loan balance was paid. B.R. does not know

who paid the outstanding balance.  B.R. does not believe anyone else at COASTAL CREDIT LLC has had issues with CLINE.

15. As noted above, CLINE's ex-wife, J.C. was interviewed by SA Murray and TFO Jared Stern, on December 13, 2019, and also earlier on June 6, 2019.  During her June 6, 2019 interview, J.C. said she and CLINE divorced in early 2014.  J.C. and CLINE have two male children, A.C., age 19, and D.C., age 15.  A.C. splits his time living with his mother, J.C., and CLINE; D.C. currently has no relationship with CLINE.  J.C. also has another male child, C.C., age 17, whose father is an unidentified African American man.  C.C., along with his half-brother A.C., also splits his time living with his mother, J.C. and CLINE.  J.C. does not have communications with CLINE but receives information about him from A.C. and C.C.

16. J.C. recalled approximately 12 years ago when she walked out of the front door of her residence and witnessed CLINE beating an African-American male with a baseball bat.  The African-American male was bleeding from his head.  J.C. grabbed the bat out of CLINE's hands to try and stop the assault.  The police were not called after this incident.

17. When CLINE found out that J.C. was having a baby with an African-American male, CLINE stated, "You're pregnant with a nigger baby!"

18. CLINE has a history of violent behavior to include punching and kicking J.C. while she was pregnant, holding a knife to her throat, throwing her down a flight of stairs, and assaulting several other people throughout the years.  J.C. has heard stories that CLINE has physically assaulted his current fiancée, to include slamming her up against walls.

19. According to J.C., CLINE also has a history of racist behavior, which she observed during their marriage.  CLINE often calls people names like "nigger" and "fag."  CLINE has called C.C. a "nigger" on several occasions.  When asked if J.C. believes that CLINE is racist, J.C.



responded "Yes, definitely." C.C. has told J.C. on several occasions that CLINE drinks alcohol excessively, uses drugs including crack cocaine, and owns and possesses several firearms.

20.  Information provided to the investigative team from COASTAL CREDIT LLC revealed that CLINE was contacted via email seven (7) times between November 26, 2018 and ending on February 6, 2019. Each time, COASTAL CREDIT LLC employees sent an email to the email address, PJ4201981@yahoo.com. The emails were not identical in content but each reminded CLINE of his outstanding balance that he owed COASTAL CREDIT LLC, provided instructions on contacting representatives from COASTAL CREDIT LLC, and discussed the option of working out payment plan for the remaining debt.

21.  Further information provided to the investigative team from COASTAL CREDIT LLC revealed that the vehicle in question regarding CLINE's outstanding balance was "traded in" at New Castle Motors located at 234 Dupont Highway, New Castle, DE, 19720 on January 17, 2019. COASTAL CREDIT LLC received full payment on February 11, 2019. COASTAL CREDIT LLC released their lien on February 19, 2019 after the payment cleared the bank. There is currently no outstanding balance for CLINE with COASTAL CREDIT LLC.

22.  On September 19, 2019, SA Murray and Task Force Officer (TFO) Jared Stern hand delivered to CLINE a letter from the United States Attorney's Office (USAO) for the District of Maryland advising CLINE that he was identified as a target in an investigation of 18 U.S.C. § 875, Interstate threatening communications. FBI SA Lance Griffin and three (3) Elkton Police Officers were also present during the interaction with CLINE. CLINE received the target letter in the driveway of his residence located at 365 W Main Street, Elkton, Maryland, 21921. After taking possession of the letter, CLINE stated, "This doesn't mean shit to me." CLINE then took the letter and threw it in a trash bin that was located in his driveway near the rear entrance to his



residence.

23.     A review of CLINE's criminal history revealed that on December 5, 2013, CLINE entered into a guilty plea in the Circuit Court of Cecil County for one (1) count of Assault – Second Degree, a misdemeanor with a maximum penalty of 10 years in prison and a $2,500 fine. Court documents received from the Cecil County Circuit Court revealed that CLINE, his attorney, and the presiding judge all signed the plea on December 5, 2013. As part of his guilty plea, CLINE was required to enroll in and complete anger management counseling.

24.     On December 6, 2013, CLINE met with his assigned probation agent, and reviewed and signed several documents. One of those documents was entitled DPP-SUP-30, Department of Public Safety and Correctional Services, Gun Possession, Special Notice for Parolees and Probationers. The document states "Under Federal Law, it is illegal for you to possess a gun of any type if: You have ever been convicted of a crime for which the penalty could have been more than a year, regardless of the sentence you actually received." This language is further explained stating that this provision "Does not include a State offense classified as a misdemeanor and punishable by a term of imprisonment of 2 years or less." Further explanation of the form states "SID No. _____, have been informed and I understand that it may be a violation of the law for me to purchase, own or possess a firearm and that it is my responsibility to know the firearms laws and to obey them." CLINE signed and dated this form on December 6, 2013. This form was witnessed by Deborah S. Lee with the Department of Public Safety and Corrections Services.

25.     An open source search of the social media platform FACEBOOK for CLINE revealed a profile containing pictures that strongly resemble CLINE's physical appearance. The name listed on the FACEBOOK profile is Phillip Cline. Located within the Intro and biographical information section of the profile, it states, "Lives in Elkton, Maryland." A photo was posted to



Facebook on January 26, 2018, that depicts a male individual dressed in camouflage clothing holding a rifle. A portion of the male's face is covered with a facemask. It appears in the photo that the male individual is hunting.

26. Another photo was posted to the CLINE FACEBOOK profile on May 2, 2019, that depicts a male individual matching the physical characteristics of CLINE holding a camouflaged colored shotgun. The individual is dressed in a blue shirt, dark colored tie, black hat, black pants and black sunglasses. The individual is holding the shotgun with both hands.

27. On December 4, 2019, the Investigators received information from the Maryland Natural Resources Police regarding hunting licenses issues to CLINE. The documents revealed that on September 13, 2019, CLINE acquired Maryland active licenses for: Full season hunting, Muzzleloader stamp, Bow stamp, and a Bonus Antlered Deer Stamp. All four (4) of these licenses are active and current through July 31, 2020. The information listed on the top of the documentation lists the individual's name as Phillip Cline Jr., Primary Address: 365 West Main Street, Elkton, Maryland, 21921, DNR id: 841293, date of birth: XX/XX/1981, and Maryland Driver's license #XXXXXXXXXXXXXXX.

28. During her December 13, 2019 interview, J.C. stated that during her relationship with CLINE, he possessed several firearms that he utilized for hunting purposes and stored them in their residence, in a safe to which he only had access. J.C. advised the Investigators that she was told by one of CLINE's sons, who sees CLINE on a regular basis and has access to CLINE's residence, that approximately one (1) or two (2) months ago, CLINE took a week off from his current employment to go hunting.

29. J.C. further stated that in addition to CLINE and his fiancée, a 17-year-old male named CALEB LNU, CALEB LNU's girlfriend, and their 11 month-old infant currently reside at



the **Target Location**.

30. Title 18, United States Code, Section 922(g)(1) of the United States Code provides that "it shall be unlawful for any person to possess a firearm who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."

31. Based on your Affiant's training, knowledge and experience, your affiant believes that CLINE possesses at least two (2) firearms, and possibly more, that he is prohibited from possessing. Your Affiant believes that CLINE stores these firearms at his primary residence, the **Target Location**. Your affiant knows that individuals who engage in hunting activities typically store their firearms in a secure location inside their primary residence. Your affiant also knows that those firearms are sometimes stored inside of a garage or an independent structure (i.e. shed) if there are young children residing inside the primary residence.

32. Specifically, your affiant believes that CLINE may try to hide or store the firearms in a place that is not readily visible due to him being advised by the court and probation agent that he is a prohibited possessor of any type of firearms or ammunition. Witness testimony from an interview with J.C. revealed that CLINE is an avid hunter and spends numerous hours purchasing hunting supplies and planning hunting trips. In addition, several of the photos on the FACEBOOK profile believed to belong to CLINE reveal CLINE purchases hunting supplies, clothing designed for hunting, and other hunting paraphernalia indicating CLINE's passion and interest in hunting.

## IV.   CONCLUSION

33. Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the respective Target Location the items set forth in Attachment B, all of which constitute evidence, fruits, and instrumentalities of, inter alia, violations of the Target Offense.



34. Wherefore, in consideration of the facts presented, I respectfully request that this Court issue a search and seizure warrant for the Target Location identified in Attachment A and authorize the search and seizure of the items described in Attachment B.

_____
Special Agent Keith Murray
Federal Bureau of Investigation

Sworn to before me this ___18TH___ day of December, 2019.

_____
The Honorable Deborah L. Boardman
United States Magistrate Judge

15

